UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| LARRY ALAN NASH, | ) |  |
|---|---|---|
| Plaintiff, | ) ) ) |  |
| vs. | ) ) | Case no. 4:15cv1870 PLC |
| NANCY A. BERRYHILL,[1] Acting Commissioner of Social Security, | ) ) ) ) |  |
| Defendant. | ) |  |

**MEMORANDUM AND ORDER**

Plaintiff Larry Nash seeks review of the decision of Social Security Commissioner, Nancy Berryhill, denying his applications for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act.[2] The Court has reviewed the parties' briefs and the entire administrative record, including the hearing transcript and medical evidence. For the reasons set forth below, the case is reversed and remanded.

*I.     Background and Procedural History*

On March 1, 2012 and August 14, 2012, Plaintiff filed applications for Supplemental Security Income and Disability Insurance Benefits.[3] (Tr. 36-39, 200, 421-27). In his applications, Plaintiff alleged he was disabled as of November 24, 2008 as a result of: diabetes; neuropathy in legs; hypertriglyceridemia; hypertension; chronic back, neck, and knee injuries;

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).
[2] The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF No. 11).
[3] The SSA denied Plaintiff's previous applications for Social Security benefits on August 1, 2007 and October 20, 2010. (Tr. 226, 251-55)

1

foot injuries; arthritis; sleep apnea; obesity; and depression. (Tr. 200-12, 251). The Social Security Administration (SSA) denied Plaintiff's claims, and he filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 251-55). After holding a hearing, the ALJ issued a decision denying Plaintiff benefits on May 17, 2013. (Tr. 197-212). Plaintiff reapplied for Disability Insurance Benefits and Supplemental Security Income on June 18, 2013. (Tr. 474-82, 483-89).

Plaintiff appealed the ALJ's decision to the SSA Appeals Council, which vacated the decision and remanded the case to a different ALJ. (Tr. 218-21). In accordance with the Appeals Council's order, the ALJ consolidated Plaintiff's June 2013 applications for benefits with the present case and held a hearing on May 27, 2014. (Tr. 117-65, 220). At the hearing, Plaintiff testified that he was fifty-one years of age, five feet eleven inches tall, and 350 pounds. (Tr. 122-23). Plaintiff had a high school diploma and had completed a two-week truck driver training. (Tr. 125). Plaintiff stated he received food stamps and Medicaid, and his mother paid his other expenses. (Tr. 124-25).

When the ALJ asked Plaintiff why he believed himself disabled, Plaintiff answered:

> Because I have neuropathy severely in my hands, in my feet. My feet and my legs I can only stand for maybe 15 minutes at a time. And when I sit down after 20 minutes my feet and legs go completely numb. And I have to get up and walk around a little bit to get feeling back in my feet and legs. And the worse thing that's happening now is it spread to my hands. When I wake up in the morning I can't feel my hands at all. And during the day . . . my hands go numb many times a day.

(Tr. 125-26). Later, Plaintiff explained: "[I]f I wake up in the morning and somebody calls I can't even – I can't even use the phone because it takes 10 minutes for my hands to not be numb. I've had people call me, wake me up, and I can't even push the buttons on the phone to even

make it work." (Tr. 137). Plaintiff testified that his hands went numb "probably 50 to 100 times a day." (Tr. 147).

In regard to the neuropathy in his feet and legs, Plaintiff stated: "I don't feel my feet at all. I have no feeling in my feet except for pain and it goes all the way up to my knees." (Tr. 138). Plaintiff rated his foot pain a seven on a ten-point scale. (Tr. 141). Plaintiff's doctor recommended he use a cane because he had "fallen lots." (Tr. 149). Plaintiff explained: "[I]f I sit down for more than 10 minutes my feet and legs go numb. And then when I try to get up to do something probably the first 12 steps I'm just – have no balance." Plaintiff estimated that he could sit for twenty minutes, stand "[b]arely 15 minutes," and lift twenty pounds. (Id.). Plaintiff also suffered constant pain in his lower back, which he rated an eight on a ten-point scale. (Tr. 140-41).

Plaintiff stated that his most recent employment was as a truck driver for a two-year period ending in 2008. (Tr. 126-27). Prior to that, he worked approximately ten years as a machine operator for Briggs & Stratton. (Tr. 127-28). After Plaintiff's previous employer terminated him on November 24, 2008, he did not obtain another job because he "can't drive anymore because I'm diabetic insulin." (Tr. 127).

Plaintiff testified that, on a typical day, he awoke around 11:00 a.m., prepared something to eat, checked his blood sugar, and took his medication. (Tr. 128). Plaintiff watched television and movies, "surf[ed] around on the net a little bit," and talked on the telephone with his mother and two adult daughters. (Tr. 129-30). Plaintiff napped "a couple hours" every day because his medications and sleep apnea made him tired. (Tr. 145). Plaintiff was able to take care of his dog and dress himself, but was having more difficulty "putting my shoes on and stuff like that," and he could get in and out of the shower but had fallen "a few times." (Tr. 131, 148). Plaintiff

3

drove to doctor appointments, his mother's house, church, and the grocery store. (Tr. 132, 134). Plaintiff was able to cook and do laundry, but his mother cleaned his floors and did his dishes "because I can't stand up long enough to do them." (Tr. 132-33). Plaintiff was no longer able to play the drums in a band, but occasionally played the drums at his church services. (Tr. 142, 150). When he played the drums at church, he usually played four songs, with breaks in between, for a total of "[m]aybe 10 minutes." (Tr. 150).

Plaintiff stopped drinking alcohol and using "street drugs" fourteen years ago. (Tr. 134). Plaintiff joined Weight Watchers and walked "around where I live" to try to lose weight. (Tr. 135). Plaintiff last walked about half to three-quarters of a mile about three weeks before and "it really hurt me." (Tr. 142-43). Plaintiff estimated he could walk three or four city blocks before needing to sit down for ten minutes. (Tr. 143).

Plaintiff believed his medications helped his symptoms, but they made him dizzy and tired. (Tr.135). Because of his history of drug abuse, Plaintiff had resisted taking prescription pain medications, but he recently began taking Tramadol for lower back pain. (Tr. 135-36). Plaintiff's diabetes was "not totally under control." (Tr. 137). Plaintiff's primary care physician prescribed Prozac for his depression, and the Prozac was "finally starting to help." (Tr. 138-39).

A vocational expert also testified at the hearing. (Tr. 151-65). The ALJ asked the vocational expert to consider a hypothetical individual with the following RFC:

> [T]he individual is limited to light work. The individual may occasionally climb ramps or stairs, must never climb ladders, ropes, or scaffolds, may occasionally balance, stoop, kneel, crouch, and crawl. The individual is limited to no use of foot pedals or pushing and pulling with the lower extremities. The individual must avoid concentrated exposure to extreme heat, extreme cold, vibration, and have no exposure to hazards such as dangerous machinery and unprotected heights, and no commercial driving. The individual is limited to simple, routine, and repetitive work as defined in the DOT as SVP levels 1 and 2, and is able to make simple, work-related decisions.

(Tr. 153). The vocational expert stated that such individual could not perform Plaintiff's past work, but could perform the jobs of plastic product inspector, hand packager, or ring marker. (Tr. 153-55). When asked to consider the same hypothetical individual but limited to sedentary work, he stated that such person could assemble optical goods and hand package pharmaceutical supplies. (Tr. 157). However, if such individual were "off task approximately 20 percent due to the combined effects of medical impairments and medications," he could not maintain employment. (Tr. 158). Additionally, a limitation to infrequent hand manipulation would preclude the hypothetical individual from performing all of the jobs identified by the vocational expert. (Tr. 159).

In a decision dated July 14, 2014, the ALJ applied the five-step evaluation process set forth in 20 C.F.R. §§ 404.1520, 416.920[4] and found that Plaintiff "has not been under a disability, as defined in the Social Security Act, from November 24, 2008, through the date of this decision[.]" (Tr. 9-24). The ALJ found that Plaintiff had the following severe impairments: diabetes mellitus with neuropathy; obstructive sleep apnea; obesity; adjustment disorder; and depression. (Tr. 11). The ALJ found that Plaintiff's back pain was "not [a] medically determinable impairment." (Tr. 12).

After reviewing Plaintiff's testimony and medical records, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects" of his

---

[4] To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520(a), 416.920(a). Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

impairments were "not entirely credible." (Tr. 19). The ALJ found that Plaintiff had the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for the following nonexertional limitations that reduce the claimant's capacity for light work: can only occasionally climb ramps or stairs; can never climb ladders, ropes or scaffolds; can only occasionally balance, stoop, kneel, crouch or crawl; can never use foot pedals; can never push or pull with the lower extremities; must avoid concentrated exposure to extreme heat, extreme cold, and vibration; must have no exposure to hazards, such as dangerous machinery and unprotected heights; must not require commercial driving; limited to simple, routine, and repetitive tasks as defined in the Dictionary of Occupational Titles ("DOT") as specific vocational preparation ("SVP") levels one and two; and can only make simple work-related decisions.

(Tr. 15, 19). The ALJ found that Plaintiff could not perform his past relevant work as a machine operator or truck driver, but could perform other jobs that exist in significant numbers in the national economy. (Tr. 22-23).

Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review on October 19, 2015. (Tr. 1-3, 5). Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II. *Standard of Review*

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Boerst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). In determining whether the evidence is substantial, a court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, a court "do[es] not reweigh the evidence presented to the ALJ and [it]

defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrue v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions" of the Social Security Administration. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

### III.  Discussion

Plaintiff claims that substantial evidence does not support the ALJ's RFC determination because the ALJ failed to assign proper weight to the medical opinion of Plaintiff's treating physician, Dr. Randall Huss.[5] (ECF No. 18). More specifically, Plaintiff argues that Dr. Huss's medical opinion was entitled to controlling, or at least great, weight and the ALJ failed to provide "good reasons" for assigning his opinion only "partial weight." According to Plaintiff, had the ALJ properly credited Dr. Huss's limitations on Plaintiff's ability to lift/carry, stand/walk, and use his hands, the ALJ would have found Plaintiff disabled. The Commissioner counters that the ALJ assigned Dr. Huss's opinion proper weight and incorporated into the RFC the limitations supported by the record. (ECF No. 23).

---

[5] Plaintiff also alleged that ALJ erred in: (1) assigning undue weight to the opinions of medical consultants; and (2) failing to re-contact Dr. Huss for clarification. (ECF No. 18). Because the Court reverses on Plaintiff's first argument, it does not address his other arguments.

A treating physician's opinion regarding a plaintiff's impairments will receive controlling weight where "the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). Even if the opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight. Id. This rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians. See 20 C.F.R. §§ 404.1527(c), 416.927(c); Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (quotation omitted).

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. §§ 404.1527(c); 416.927(c). Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).

Plaintiff's earliest record of treatment by Dr. Huss reflects that Dr. Huss treated him for back pain in July 1999 and August 2002 and for hyperlipidemia in October 2002, June 2004, and January 2005. (Tr. 965, 970, 972-73). In April 2006, Plaintiff saw Tracy Fair-Parsons, PA-C, a

physician's assistant in Dr. Huss's office, for right foot pain, weight gain, and depression. (Tr. 958). In September 2006, Plaintiff reported right foot pain, as well as stiffness in hands, to PA Fair-Parsons. (Tr. 955).

At a Department of Transportation physical in January 2007, doctors discovered that Plaintiff had elevated blood sugar and sent him to the emergency room, where he was diagnosed with diabetes mellitus and prescribed insulin. (Tr. 953, 974-78). In March 2007, Plaintiff called Dr. Huss's office and requested Vicodin for knee pain. (Tr. 953). At a follow-up appointment with PA Fairs-Parson in April 2007, Plaintiff informed her that he was feeling better but his feet were numb "at times" and he was taking Vicodin for his leg pain. (Tr. 952). At that time, Plaintiff weighed 313 pounds. (Id.).

In May 2007, Plaintiff underwent a nerve conduction study, the results of which were "abnormal" and consistent "with sensory motor polyneuropathy[.]" (Tr. 950). In June 2007, Plaintiff informed PA Fair-Parsons that he recently lost his job and was "quite distraught as he is not able to stand for long periods without legs hurting and therefore cannot do factory type work." (Tr. 949). When Plaintiff next saw PA Fairs-Parsons in April 2008, he weighed 335 pounds and reported that his leg pain had improved. (Tr. 1064).

After a two-year hiatus during which Plaintiff received care at another clinic, Plaintiff reestablished care for his diabetes and "extremities weakness" with Dr. Huss in December 2010. (Tr. 746-53, 1075-86). Plaintiff reported that he had lost weight and was following a low-carbohydrate diet. (Tr. 748). He informed Dr. Huss that, after trying his friend's gabapentin, he was able to "feel feet for 1st time in long time," and requested a prescription. (Tr. 748).

At his next appointment with Dr. Huss in January 2011, Plaintiff weighed 298 pounds and reported that the "gabapentin [was] helping a lot" and he was continuing to lose weight. (Tr.

755). At this appointment, Dr. Huss completed an RFC questionnaire specific to patients with diabetes mellitus. (Tr. 665-69). Dr. Huss wrote that: Plaintiff suffered diabetes mellitus, diabetic neuropathy, and sleep apnea; his prognosis was "fair"; and his symptoms included fatigue, difficulty walking, episodic vision blurriness, muscle weakness, extremity pain and numbness, loss of manual dexterity, hyper/hypoglycemic attacks, and numbness in feet. (Tr. 655). Dr. Huss noted that, in a typical work day, Plaintiff's "experience of pain or other symptoms" would frequently be "severe enough to interfere with attention and concentration needed to perform even simple work tasks." (Tr. 666).

In regard to Plaintiff's limitations, Dr. Huss stated that Plaintiff could: walk four city blocks without rest or severe pain; sit for thirty minutes at a time; stand for fifteen minutes at a time; and sit, stand, or walk about two hours total in an eight-hour work day. (Id.). Dr. Huss estimated that Plaintiff would need to walk for about five minutes every thirty minutes and would require unscheduled work breaks hourly. (Tr. 667). Dr. Huss found that Plaintiff could: frequently carry less than ten pounds; occasionally carry ten to twenty pounds; rarely carry fifty pounds; never climb ladders; rarely twist, stoop/bend, or crouch/squat; and frequently climb stairs. (Id.). Dr. Huss opined that Plaintiff had significant limitations to reaching, handling, and fingering so that, in an eight-hour workday: he could grasp, twist, turn objects 10% of the time; use his fingers for "fine manipulations" 10% of the time; and reach his arms 20% of the time. (Tr. 668). Dr. Huss estimated that Plaintiff would likely be absent from work about two days per month. (Id.).

At a follow-up appointment with Dr. Huss in March 2011, Plaintiff weighed 307 pounds, admitted to poor diet and diabetic control, and reported that the neuropathy in his feet was getting worse. (Tr. 676). Dr. Huss increased Plaintiff's insulin and gabapentin and advised him

to return in three months. In June 2011, Plaintiff informed Dr. Huss that "he has to stop walking all the time [due to] pain and then when he gets up, he can't feel his feet and legs." (Tr. 684). Plaintiff was having difficulty losing weight and was experiencing high blood sugar levels in the morning. (Id.).

In August 2011, Plaintiff presented to Dr. Huss's office without an appointment, and Dr. Huss increased Plaintiff's insulin. (Tr. 692-93). Plaintiff returned to Dr. Huss's office in September 2011 and complained of neuropathy, admitted to poor diet, and informed Dr. Huss that his blood sugar was recently "over 400 and sometimes over 500." (Tr. 699). Dr. Huss prescribed insulin lispro. (Id.). When Plaintiff followed up with Dr. Huss in November 2011, Plaintiff weighed 315 pounds. (Tr. 707). His diabetic control was "dramatically better," but he continued to complain of neuropathy in his feet and legs. (Tr. 707).

At Plaintiff's appointment in March 2012, Dr. Huss wrote that Plaintiff had "bad insulin-dependent diabetes for years. Has bad diabetic neuropathy of feet," which "largely limits him due to pain and numbness worsening with standing or walking." (Tr. 721). Dr. Huss continued Plaintiff's insulin and gabapentin. (Tr. 723). On the same day, Dr. Huss wrote a letter stating: "I have determined [Plaintiff] is unable to work in any type of gainful employment that he has done in the past based on his diagnosis of severe diabetic neuropathy It has been determined that this will continue lifelong." (Tr. 675).

At a check-up in June 2012, Plaintiff weighed 323 pounds. (Tr. 833-39). Plaintiff complained of depression, and Dr. Huss prescribed citalopram. (Id.). Dr. Huss noted: "Neuropathy is controlled fairly well. Does bother him at times." (Tr. 846).

The following month, Plaintiff saw Dr. Josh Garrison, a podiatrist, and complained that his neuropathy was worsening. (Tr. 840-42). Plaintiff reported "[w]hen he first started the

gabapentin there was much more of a benefit than at current," but he was currently taking "1800 mg of Neurontin daily without much benefit." (Tr. 840). Plaintiff also "note[d] great difficulty in walking any distance at all and standing for any length of time." (Id.). Dr. Garrison opined that Plaintiff's "neuropathic pain may somewhat improve with better [diabetic] control; however, it is likely that he will experience some type of chronic pain issue with this condition." (Tr. 841). Dr. Garrison increased Plaintiff's Neurontin and ordered diabetic shoes. (Id.). In September 2012, Plaintiff informed Dr. Huss that his neuropathy was "better" with the higher dose of gabapentin, as was his depression. (Tr. 853).

Plaintiff returned to Dr. Garrison in October 2012, and "still report[ed] significant pain to feet and lower legs with almost any activity that requires him to be on his feet." (Tr. 857-58). Due to an "apparent misunderstanding," Plaintiff had not begun wearing diabetic shoes and inserts, so Dr. Garrison prescribed them again. (Id.).

When Plaintiff returned to Dr. Huss's office in January 2013, he informed Dr. Huss that his diabetes was "in worse control since holidays" and his diabetic shoes were "helping a lot with walking and neuropathy pain." (Tr. 875). Plaintiff weighed 323 pounds. (Tr. 873). He expressed concern that the citalopram made him "angry and irritable, lethargic and no ambition," Dr. Huss stopped Plaintiff's Celexa and prescribed Effexor. (Tr. 876-77). Dr. Huss noted that Plaintiff was taking Aleve for "chronic low back pain." (Tr. 875).

In April 2013, Plaintiff informed Dr. Huss that his diabetes "has been out of control for a few days," making him "feel lethargic, like delirium." (Tr. 1295). Plaintiff was exercising at a gym and walking, but admitted "diet compliance not good." (Id.). Plaintiff suffered restless leg syndrome "throughout the day, worse in evening." (Id.). Plaintiff was not tolerating Effexor

well and continued experiencing depressive symptoms, so Dr. Huss discontinued the citalopram and prescribed fluoxetine. (Id.).

When Plaintiff returned to Dr. Huss's office in July 2013, he reported that the fluoxetine "has worked well for his depression" and his blood sugar readings had improved "since getting really serious about low [carbohydrate] diet," but he was "still gaining weight." (Tr. 1268). Dr. Huss noted that Plaintiff: "has severe diabetic neuropathy in feet and legs to knees, and now in hands for past year or more. Having balance problems when first gets up and tries to walk from bed or sitting. Some falls and near falls. Can't feel feet at all." (Id.). Dr. Huss determined that Plaintiff was "[d]eveloping sensory ataxia" and prescribed Elavil. (Tr. 1271). At his next appointment in October 2013, Plaintiff requested diabetic shoes and socks. (Tr. 1310-12).

In December 2013, Plaintiff informed Dr. Huss that "[h]e has gotten diabetes under better control with higher doses of insulin and better diet efforts, walking. Has lost a few pounds." (Tr. 1305). Plaintiff weighed 344 pounds. (Tr. 1302). Dr. Huss noted that Plaintiff's "peripheral neuropathy is still bad, but improved with addition of Requip for restless leg syndrome and Elavil." (Tr. 1305).

On the day of the December 2013 examination, Dr. Huss completed a physical RFC assessment for Plaintiff. (Tr. 1278-82). Dr. Huss opined that, in an eight-hour work day, Plaintiff could: stand two hours; walk one hour; work two hours; and sit four hours with fifteen-minute breaks every thirty minutes. (Tr. 1278). According to Dr. Huss, Plaintiff was able to lift or carry: up to ten pounds frequently; up to fifty pounds occasionally; and over fifty pounds never. (Id.). Dr. Huss wrote: "[Plaintiff's] diabetic neuropathy makes handling or carrying any significant weight dangerous + prone to falling[,] affects coordination." (Id.). In regard to Plaintiff's ability to use his hands, Dr. Huss stated that Plaintiff was not capable of "simple

13

grasping" and "fine manipulation," but was able to perform "limited" pushing and pulling. (Tr. 1279). He explained: "Diabetic peripheral neuropathy affecting hands limits use of hands for" repetitive grasping and fine manipulation. (Id.). Dr. Huss stated that Plaintiff's diabetic neuropathy also caused "poor balance" and precluded him from using his feet for repetitive movements, such as operating foot controls. (Id.).

Later that month, Dr. Huss wrote a letter stating that Plaintiff "is unable to work any type of gainful employment, based on his diagnosis of severe diabetic peripheral neuropathy and the limitations it imposes on use of his upper and lower extremities." (Tr. 1301). In addition, Dr. Huss advised that "this condition will be lifelong and is not likely to be remediable." (Tr. 1301.)

At his appointment with Dr. Huss in February 2014, Plaintiff weighed 341 pounds and expressed concern about his weight because, despite doing Weight Watchers for approximately two months and walking regularly, he had only lost four pounds. (Tr. 1315). Plaintiff also reported that his neuropathy was "getting worse. Difficulty walking. May be needing cane. Even having numbness in hands." (Id.). Dr. Huss diagnosed Plaintiff with sensory ataxia. (Tr. 1318). Dr. Huss discontinued Plaintiff's gabapentin and prescribed Lyrica and a cane. (Tr. 1318).

In May 2014, Plaintiff weighed 350 pounds. (Tr. 1326). He reported satisfactory blood sugar levels but expressed frustration "with inability to lose weight." (Tr. 1326). Plaintiff also complained of: "[L]ow back pain for many years. . . . Some sciatica in left leg. About L5 radiculopathy. Constant pain. Never goes away." (Id.). Dr. Huss prescribed Tramadol for back pain and ordered spinal x-rays. (Tr. 1329).

In her decision, the ALJ assigned Dr. Huss's opinion "partial weight." (Tr. 19). The ALJ acknowledged that treating physicians' opinions are generally entitled to more weight but stated

that an ALJ may discount or disregard such opinions if they are not supported by substantial medical evidence in the record or the doctor has offered inconsistent opinions. (Tr. 20). The ALJ reasoned that Dr. Huss's opinions were entitled to only partial weight because:

> Dr. Huss's opinions stand alone with limitations that were not mentioned in his numerous records of treatment and are not supported by objective testing or reasoning which would indicate why the claimant's functioning need be so restricted. Additionally, Dr. Huss's pattern of treatment of the claimant was generally conservative without escalating modalities and his physical examinations of the claimant do not support the opined limitations and generally had minimal supportive clinical signs.

(Tr. 20). The ALJ also stated that a treating physician's opinion as to whether a claimant is able to work is an administrative finding reserved for the Commissioner.[6] (Id.).

Although the ALJ did not specify which aspects of Dr. Huss's RFC assessment she credited and which she discounted, a review of the record reveals that the ALJ agreed with Dr. Huss in regard to Plaintiff's inability to use foot pedals and abilities to lift and/or carry ten pounds frequently and twenty pounds occasionally and balance, stoop, kneel, crouch, or stoop occasionally. As to aspects of Dr. Huss's opinion that she discounted (such as limitations on standing, walking, sitting, and use of hands), the ALJ provided no explanation beyond the previously quoted, conclusory statements that Dr. Huss's opinions were not supported by his treatment records or objective medical testing and that Plaintiff's treatment was conservative in nature.

A review of the record reveals that, contrary to the ALJ's finding, Dr. Huss's opinion did not stand alone and was consistent with his treatment records. Indeed, Dr. Huss's treatment

---

[6] Plaintiff concedes that the ALJ properly discounted Dr. Huss's "narrative conclusions" that Plaintiff was "unable to work." (ECF No. 18 at 20). A treating physician's opinion that a claimant is unable to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). Importantly, Plaintiff's appeal focuses on the weight the ALJ assigned Dr. Huss's RFC assessment, not his March 2012 and December 2013 letters stating that Plaintiff was disabled.

15

notes are replete with consistent complaints of extremity weakness and pain, numbness in feet and hands, and difficulty walking. The record reflects that Plaintiff began complaining about neuropathy in his feet and an inability to stand for extended periods of time in 2007. A nerve conduction study of the same year produced "abnormal" results and confirmed Plaintiff's sensory motor polyneuropathy. When Plaintiff returned to Dr. Huss's care in late 2010, he regularly complained of difficulty walking, and pain and numbness in his feet, legs, and hands. Dr. Huss prescribed and periodically increased Plaintiff's prescription of gabapentin. In January 2011, Dr. Huss completed an RFC assessment in which he noted Plaintiff's loss of manual dexterity, in addition to his foot pain, difficulty walking, extremity pain and numbness, and fatigue.

Dr. Huss continued to examine Plaintiff every two to three months for the next three years, and Plaintiff consistently complained of neuropathy, difficulty standing and walking, and numbness in his feet after sitting. In Spring 2013, Plaintiff also complained of restless leg syndrome, and in Summer 2013, Dr. Huss noted that Plaintiff suffered severe diabetic neuropathy in feet, legs, and hands, and was developing sensory ataxia. Dr. Huss changed Plaintiff's medicine from gabapentin to Elavil. In Winter 2014, Dr. Huss noted that Plaintiff's neuropathy was worsening in his feet and hands and he was having problems with falling. Dr. Huss diagnosed Plaintiff with sensory ataxia, discontinued Plaintiff's gabapentin, and prescribed Lyrica and a cane.[7]

In addition to being consistent with his own treatment notes, Dr. Huss's medical opinion was consistent with the treatment notes of Plaintiff's podiatrist, Dr. Garrison. Plaintiff first saw

---

[7] To the extent that the ALJ discounted Dr. Huss's opinion because his treatment notes did not reflect his opined work restrictions "[i]t does not seem unusual that a physician would see no need to make specific treatment notes on an unemployed patient's need for work [restrictions] during a routine medical examination." Leckenby v. Astrue, 487 F.3d 626, 633 n.7 (8th Cir. 2007).

Dr. Garrison in Summer 2012, and he noted "great difficulty in walking any distance at all and standing for any length of time." When Plaintiff returned to Dr. Garrison's office in Fall 2012, he again reported significant pain in feet and lower legs "with almost any activity that requires him to be on his feet."[8]

The ALJ also discredited Dr. Huss's medical opinion because his treatment of Plaintiff "was generally conservative without escalating modalities." The record reflects that Dr. Huss regularly prescribed different combinations and dosages of medications to treat Plaintiff's neuropathy. As to escalating modalities for Plaintiff's treatment, the Court finds no suggestions for alternate or escalating modalities in either the record or the ALJ's decision.

Under the framework provided by the regulations, Dr. Huss's opinion was entitled to controlling weight. Dr. Huss began treating Plaintiff in 1999, and he examined Plaintiff over twenty times between December 2010 and May 2014. See 20 C.F.R. §§ 404.1527(d)(2)(I), 416.927(d)(2)(I) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). Dr. Huss was Plaintiff's primary care provider and the sole physician treating and monitoring Plaintiff's diabetes, and he consistently rendered the same diagnoses. Other record evidence and laboratory testing supported Dr. Huss's opinion, and his opinion was not inconsistent with other substantial evidence of record. Based on the above, the Court finds that the ALJ failed to properly weigh Dr. Huss's opinion and thus failed to properly assess Plaintiff's

---

[8] In support of her assertion that Dr. Huss's opinions were inconsistent with the medical evidence, the Commissioner cites only Dr. John Demorlis's evaluation. (ECF No. 18 at 20). The Court notes that, Dr. Demorlis was a one-time consultative examiner who examined Plaintiff in July 2010, four years prior to the ALJ's July 2014 decision. "The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir.2003).

RFC such that substantial evidence does not support the ALJ's determination. See, e.g., Gordon v. Astrue, 801 F.Supp.2d 846, 859 (E.D.Mo. 2011).

## IV. *Conclusion*

Plaintiff asks the Court to order the Commissioner to pay benefits. The Court has the authority to "enter, upon the pleadings and transcript of the record, a judgment, affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Generally, when a plaintiff was improperly denied benefits, the court remands the case to the ALJ for further administrative proceedings. Buckner v. Apfel, 213 F.3d 1006, 1011 (8th Cir. 2000) (quoting Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998)). However, "[w]here the total record convincingly establishes disability and further hearing would merely delay the receipt of benefits, this court has ordered the immediate award of benefits without further proceedings." Blakeman v. Astrue, 509 F.3d 878, 889 (8th Cir. 2007).

There is no dispute that, had the ALJ credited Dr. Huss medical opinion, she would have found Plaintiff disabled. In this case, Plaintiff has been consistently diagnosed with diabetic neuropathy and his medical records reflect that the severity of his condition has steadily worsened. Under the circumstances, we find that remanding would only delay this case further. Plaintiff filed his applications for Social Security benefits in March and August 2012. The ALJ denied his applications in May 2013, the SSA Appeals Council remanded the case in September 2013, and the ALJ again denied his applications in July 2014. As result, it has taken approximately five years for this case to reach this court. To delay this case further for another ALJ hearing would be an injustice.

**IT IS HEREBY ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision is reversed and remanded for the awarding of benefits.

An order of remand shall accompany this memorandum and order.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of August, 2017